## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

FAITH ALLEN,

           Plaintiff,                        CASE NO. 10-cv-13217

v.                                            PAUL D. BORMAN
                                            UNITED STATES DISTRICT JUDGE

STANDARD INSURANCE CO.,

           Defendant.
_____/

### ORDER (1) GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Dkt. No. 21) AND (2) DENYING PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT (Dkt. No. 20)

This case involves Faith Allen's ("Plaintiff") claim for long-term disability benefits, pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1000, et seq. ("ERISA"). The Complaint was filed on August 13, 2010. (Dkt. No. 1.) On May 10, 2011, Standard Insurance Company ("Defendant") and Plaintiff filed cross motions for judgment on the administrative record. (Dkt. Nos. 20 and 21.) Both parties also filed responses on June 6, 2011. (Dkt. Nos. 24 and 25.) A hearing was held August 3, 2011.

For the reasons stated below, the Court will:

(1) Deny Plaintiff's Cross Motion for Entry of Judgment Seeking Reversal of Defendant's Decision to Deny Plaintiff's Claim;

(2) Grant Defendant's Motion for Judgment on the Administrative Record, and

(3) Dismiss the case.

1

## I. BACKGROUND

On October 5, 2007, at 8:35 a.m., Plaintiff was driving to work when her vehicle crossed over the centerline into oncoming traffic and collided head-on with a cement mixer truck. The responding officer noted that Plaintiff appeared to have been drinking and that alcohol was involved in the accident. (R. 812-15.)

Plaintiff was initially taken to St. Vincent's Hospital in Toledo, Ohio, where her initial blood work was done. A blood test administered sometime after Plaintiff arrived at the hospital reflected a blood-alcohol level of .134 percent. (R. 319.) She was later transferred to Chelsea Community Hospital in Michigan, where she was diagnosed with a severe skull fracture and a closed-head injury, which caused severe and disabling impairments to her speech, memory, and motor skills. (R. 460-63.)

Plaintiff was charged with Operating While Intoxicated Causing Serious Injury, a felony. However, this charge was later reduced to Operating While Intoxicated. Plaintiff eventually pled guilty to Careless Driving pursuant to a plea agreement with the prosecutor. (R. 631-34.)

Plaintiff's long-term disability policy provides as follows:

> Payment of [long-term disability] Benefits is limited to 24 months during your entire lifetime for a Disability caused or contributed to by any one or more of the following . . . :
>
> . . . .
>
> 2. Substance abuse . . . .

(R. 26.) Plaintiff began receiving long-term disability payments on April 2, 2008. (R. 756-59.) In a letter dated April 10, 2008, Defendant informed Plaintiff that her long-term disability benefits would end after 24 months, because it had determined that her disability was "caused or

2

2:10-cv-13217-PDB-PJK   Doc # 26   Filed 08/17/11   Pg 3 of 10   Pg ID 1246

contributed to by" substance abuse. (R. 751-52.)

On December 4, 2008, Defendant contacted Plaintiff and discussed her prospects for returning to work.[1] At this time, Defendant and Plaintiff also discussed the benefits limitation due to Plaintiff's substance abuse. Plaintiff claimed that she was not aware of the limitation, denied that alcohol was involved in her automobile accident, and stated that "those charges were dropped." (R. 640.)

On December 10, 2008, Plaintiff emailed Defendant stating that "[t]he drinking charge that you have in the Standard documents is not correct." (R. 626.) In support of her claim, Plaintiff forwarded to Defendant the documents regarding her criminal case and plea bargain. (R. 626.)

Defendant consulted with Dr. George Spady regarding whether alcohol contributed to Plaintiff's car accident and subsequent disability. After reviewing Plaintiff's treatment records, Dr. Spady concluded as follows:

> In regard to whether this [alcohol consumption] contributed to her accident I would say most likely her degree of alcohol [sic] played a major factor in her accident and her inability to adequately operate and control her motor vehicle, and her perceptions and judgment and coordination would have been impaired at the time of the accident. It would have been a major contributing factor to her subsequent brain injury, brain trauma, and subarachnoid and subdural and extradural hemorrhage, and would have been a major contributing factor to her subsequent limitations in regard to her aphasia and other neurological deficits that she has. I do not see any other reasons why she would have had the accident, [sic] it appears to be totally related to her alcohol ingestion at the time of

---

[1]On August 14, 2008, Plaintiff's then-treating physician, Dr. Brian Chodoroff, released her to return to work beginning August 22, 2008, but later noted that he believed she was unable to perform an executive-level job due to her cognitive deficits, and suggested Plaintiff utilize a "job coach." (R. 388, 393-94.)

the accident.

(R. 231.)

On April 7, 2009, Defendant informed Plaintiff that it had reviewed her file and concluded that her disability was caused or contributed to by substance abuse, and that it would apply the Substance Abuse Limitation to her claim. (R. 611.) In an August 7, 2009 email to Defendant, Plaintiff asked to "have someone else look at" her claim for full long-term disability benefits. (R. 606.) Plaintiff stated the basis for the review as follows:

> I have talked to some lawyers and they are sure that the court information that we had about a year and a 1/2 ago would do away with your claim. They were trying to get information from St. Vincent's and were told that St. Vincent's would not stand behind the information. . . . .
>
> I had an Anti-Bacterial hand gel break in the accident and that is why the police officer thought it was something else. He quickly came to a conclusion that he was mistaken. The case was very quickly dismissed.

(R. 606.)

Defendant consulted a second physician, Dr. Bradley Fancher, who concluded, based on Plaintiff's blood-alcohol level, that alcohol contributed to or caused her motor vehicle accident. Dr. Fancher further stated, "I have reviewed the memo authored by Dr. Spady. I am entirely in agreement with his conclusions." (R. 221.)

In a letter to Plaintiff dated September 1, 2009, Defendant stated that the Administrative Review Unit had completed its review of her file and found "the decision to limit [Plaintiff's] claim was correct and must be upheld." (R. 587.) Plaintiff then filed the instant claim with this Court.

4

## II. STANDARD OF REVIEW

The parties agree that the *de novo* standard of review applies in this case. *See Schwalm v. Guardian Life Ins. Co. of Amer.*, 626 F.3d 299, 308 (6th Cir. 2010).

Under the *de novo* standard, the Court considers the record "without deference to the [administrative] decision or any presumption of correctness, based on the record before the administrator." *Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir. 1990). This standard applies to both factual and legal conclusions by the plan administrator. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 614 (6th Cir. 1998).

## III. ANALYSIS

It is Plaintiff's burden to show that she is entitled to disability benefits under the terms of the policy. *Smith v. Ameritech*, 129 F.3d 857, 865-66 (6th Cir. 1997). However, where disability is not disputed, as in the instant case, the plan administrator bears the burden of proof regarding an exclusion from coverage. *McCartha v. National City Corp.* 419 F.3d 437, 443 (6th Cir. 2005).

Two independent documents in the administrative record support the plan administrator's decision to exclude coverage based on the substance abuse limitation: (1) the traffic crash report completed by the police officer at the scene of Plaintiff's automobile accident, and (2) Plaintiff's blood test conducted the day of the crash during her treatment at St. Vincent's Hospital. The traffic crash report indicates that Plaintiff appeared to have been drinking, and Plaintiff's later blood test reflects a blood-alcohol level of .134 percent – well above Michigan's legal limit of .08 percent.

Plaintiff argues that these documents are both flawed. She states that the police officer at

5

the scene of the accident mistook the smell of a broken bottle of hand sanitizer for alcohol that she had consumed. However, she has not shown that the police officer recanted any part of the traffic crash report. Likewise, Plaintiff states that the blood test is unreliable because Defendant cannot prove, through a chain of custody, that it was actually her blood sample that contained a .134 blood-alcohol level. But Plaintiff has not produced any evidence tending to prove that her blood sample could have been tainted.

Plaintiff primarily focuses on the criminal proceedings following the October 5, 2007 crash, arguing that the prosecutor's plea bargain is evidence that the police report and blood test results are unreliable. But Plaintiff has not produced a state trial court record wherein the prosecutor withdraws the Operating Under the Influence charges due to unreliable evidence.[2]

The Supreme Court has recognized that states have a "legitimate interest in encouraging the entry of guilty pleas and in facilitating plea bargaining, a process mutually beneficial to both the defendant and the State." *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978). Aside from the evidentiary issues raised by Plaintiff, various other factors could have been incorporated into the plea agreement, including Plaintiff's lack of a criminal record, her likelihood of becoming a repeat offender, and her disability resulting from the crash. Simply put, Plaintiff's decision to plea to careless driving, rather than go to trial on an operating under the influence charge, is not proof that the evidence of her intoxication is tainted.

Accordingly, taking the administrative record as a whole, Defendant has shown by a preponderance of the evidence that Plaintiff was intoxicated at the time of her accident, and that

---

[2]The Court notes that a prosecutor has a duty to disclose material exculpatory evidence and to correct unsolicited false evidence. *See Giglio v. United States*, 405 U.S. 150, 155 (1972).

6

her level of intoxication was a contributing factor to the collision and disability.

Plaintiff argues that Defendant is operating under a conflict of interest because it funds the plan and evaluates the claims. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). Because the Court is considering the record *de novo* without any deference to the plan administrator, any potential conflict of interest is immaterial. *Price v. Hartford Life and Acc. Ins. Co.*, 746 F. Supp. 2d 860, 867 (E.D. Mich. 2010) ("If the standard of review is *de novo*, then the significance of the administrator's conflict of interest evaporates.").

Plaintiff argues, however, that Defendant's conflict of interest effected its underlying investigation of her claim, and therefore influenced the administrative record that the Court is considering *de novo*. Plaintiff argues that Defendant did not investigate her claims that hand sanitizer could be mistaken for the smell of alcohol, that her blood test was tainted, or whether the accident was caused when Plaintiff was distracted by her phone. But the administrative record reflects that Defendant did investigate Plaintiff's claims. Specifically, Defendant did consider the state court records submitted by Plaintiff and also obtained her hospital records to confirm her blood-alcohol level on the day of the accident. (R. 616.)

The fact that Defendant did not investigate the possibility that Plaintiff was also distracted by her phone prior to the accident, or whether the police officer could have only smelled hand sanitizer at the scene of the accident, or that Plaintiff's blood sample was somehow tainted after the accident, is not material. Further, none of Plaintiff's "shotgun" alternative theories regarding the accident would necessarily disprove that she was also driving while intoxicated. The police report and Plaintiff's blood test both reflect that she was intoxicated on the morning of the accident, and it was therefore reasonable for Defendant to conclude that the

7

collision was caused by her substance abuse.

Plaintiff next argues that the substance abuse provision in the policy is vague.  The policy provides as follows: "Substance Abuse means use of alcohol, alcoholism, use of any drug, including hallucinogens, or drug addiction." (R. 26.)  Plaintiff argues that the phrase "use of alcohol," in the common parlance understood by an ordinary policy holder, could be interpreted as follows: "that one [who] has one drop of alcohol, has an allergic reaction to the alcohol, and then has a car accident causing disability would be limited to two years of benefits under the substance abuse clause." (Pl.'s Br. 15.)

Plaintiff's argument fails when "use of alcohol" is read in the context of the substance abuse provision.  Coupled particularly with the word "alcoholism" and the phrase "drug addiction," it is clear that an ordinary policy holder would not interpret the phrase "use of alcohol" as Plaintiff argues. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("In context, . . . meanings are narrowed by the commonsense canon of *noscitur a sociis* – which counsels that a word is given more precise content by the neighboring words with which it is associated.").

Plaintiff argues that the substance abuse provision should not apply because her disability was caused by a car accident, not by substance abuse. *See Kovach v. Zurich Amer. Ins. Co.*, 587 F.3d 323, 338-39 (6th Cir. 2010) (finding that policy's "self-inflicted wound" provision did not limit coverage because the plaintiff's injuries "were the result of the collision, not simply a consequence of his acts of drinking and driving.").

The instant policy language is distinguishable from the policy in *Kovach*, which provided "that no benefits were payable if the loss is 'caused by or connected with . . . a purposeful self-

8

inflicted wound." *Id.* at 338. Defendant's policy limits benefit payments to two years for "a Disability caused *or contributed to* by" substance abuse. (R. 26) (emphasis added.) Thus, while Plaintiff may not have intended to harm herself by drinking, her level of intoxication did contribute to the accident that caused her disability. *See id.* at 339 ("Kovach's intoxication likely contributed to the collision, but to define his excessive drinking as a purposefully self-inflicted wound would be an illogical and startling construction.") (citations and punctuation omitted.) The decision to limit Plaintiff's coverage under the substance abuse clause does not conflict with the reasoning in *Kovach*.

Plaintiff's final argument also relies on *Kovach*, which stated in *dicta* that defendant had not sufficiently proven that the plaintiff had taken Vicodin prior to his accident. *Id.* at 332 (noting that "because [defendant] did not pursue the matter and did not rely on the Vicodin-related argument in denying coverage, it is not relevant to our analysis."). Plaintiff argues that Defendant's failure to "pursue" her claims that her blood test was tainted and not credible means that Defendant has conceded this issue to Plaintiff.

However, as noted *supra*, Defendant did investigate Plaintiff's claims by requesting hospital records and court documents, all of which appear in the administrative record before this Court. Based on these documents, it was reasonable for Defendant to limit Plaintiff's coverage under the substance abuse provision.

Moreover, the evidence of opiate use in *Kovach* "was due to medically administered valium and morphine given to Mr. Kovach after the accident, a contention not refuted by the record." *Id.* at 327. This is distinguishable from the instant case, in which Plaintiff's use of alcohol was documented by the police officer at the scene of the accident and by her initial blood

9

work taken upon her initial arrival to the emergency room.

## IV.  CONCLUSION

For the reasons stated above, the Court will:

(1) **DENY** Plaintiff's Cross Motion for Entry of Judgment Seeking Reversal of

Defendant's Decision to Deny Plaintiff's Claim;

(2) **GRANT** Defendant's Motion for Judgment on the Administrative Record, and

(3) **DISMISS** the case **WITH PREJUDICE**.


**SO ORDERED**.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  8-17-11

10